# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### NORTHERN DIVISION

| | | |
|---|---|---|
| **DAWN FLEMING-GRIFFIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **V.** | ) | **Case No. 2:13CV69 CAS** |
| | ) | **(NCC)** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.[1]** | ) | |

## REPORT AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner denying the application of Dawn Fleming-Griffin (Plaintiff) for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq. Plaintiff has filed a brief in support of the Complaint. (Doc. 12). Defendant has filed a brief in support of the Answer. (Doc. 18). This matter was referred to the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636. (Doc. 13).

## I.
## PROCEDURAL HISTORY

Plaintiff filed her application for DIB, alleging a disability onset date of March 1, 2008. (Tr. 240). Plaintiff's application was denied and she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 99). In August 2009, a hearing was held before an ALJ. (Tr. 32-49). In a decision dated September 8, 2009, the ALJ found Plaintiff not disabled. (Tr.

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she should be substituted for Michael J. Astrue as the defendant. No further action need be taken to continue this suit by reason of the last sentence of § 205(g) of the Act.

96-109). While Plaintiff's appeal was pending, she filed a second application for benefits. (Tr. 265). Plaintiff filed a request for review with the Appeals Council, which remanded the matter to the ALJ.[2] (Tr. 112-16). A second hearing, at which the old and new applications were consolidated, was held before a different ALJ. (Tr. 50-52). On January 24, 2012, the ALJ issued a decision unfavorable to Plaintiff. (Tr. 12-23). The Appeals Council denied Plaintiff's request for review. (Tr. 1-5). As such, the second ALJ's decision is the final decision of the Commissioner.

## II.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484

---

[2] The Appeals Council directed the ALJ to obtain evidence from a vocational expert regarding Plaintiff's past relevant work and the effects of her assessed limitations on the occupational base. (Tr. 112-16).

F.3d 1040, 1043 (8th Cir. 2007) (quoting <u>Caviness v. Massanari</u>, 250 F.3d 603, 605 (8th Cir. 2001) (citing <u>Nguyen v. Chater</u>, 75 F.3d 429, 430-31 (8th Cir. 1996)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); pt. 404, subpt. P, app. 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. <u>See</u> <u>id.</u>

Fourth, the impairment must prevent the claimant from doing past relevant work. 20 C.F.R. §§ 416.920(f), 404.1520(f). The burden rests with the claimant at this fourth step to establish his or her Residual Functional Capacity (RFC). <u>See</u> <u>Steed v. Astrue</u>, 524 F.3d 872, 874 n.3 (8th Cir. 2008) ("Through step four of this analysis, the claimant has the burden of showing that she is disabled."); <u>Eichelberger</u>, 390 F.3d at 590-91; <u>Masterson v. Barnhart</u>, 363 F.3d 731, 737 (8th Cir. 2004); <u>Young v. Apfel</u>, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).

Fifth, the severe impairment must prevent the claimant from doing any other work. 20 C.F.R. §§ 416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to show evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. <u>See</u> <u>Steed</u>, 524 F.3d at 874 n.3; <u>Young</u>, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." <u>Id.</u> <u>See also</u> <u>Harris v. Barnhart</u>, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)); <u>Stormo v. Barnhart</u>, 377 F.3d 801,

806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC."). Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. See Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. See Cox, 495 F.3d at 617; Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1993); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of

evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. See Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. See Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. See Krogmeier, 294 F.3d at 1022; see also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

To determine whether the Commissioner's final decision is supported by substantial evidence, the court is required to review the administrative record as a whole and to consider:

(1) Findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

Additionally, an ALJ's decision must comply "with the relevant legal requirements." Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322.

The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. See id. The ALJ must also consider the plaintiff's prior

work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing.  See Polaski, 739 F.2d at 1322; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him or her to reject the plaintiff's complaints.  See Guilliams, 393 F.3d at 801; Masterson, 363 F.3d at 738; Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995).  It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he or she considered all of the evidence.  Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992); Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988).  The ALJ, however, "need not explicitly discuss each Polaski factor."  Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004).  See also Steed, 524 F.3d at 876 (citing Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)).  The ALJ need only acknowledge and consider those factors.  See id.  Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence.  See Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a)(1), and includes an assessment of physical abilities and mental impairments.  20 C.F.R. § 404.1545(b)-(e).  The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy.  See Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)).  The Commissioner must first prove that the claimant retains the RFC to perform other kinds of work.  See Goff, 421 F.3d at

790; Nevland, 204 F.3d at 857. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. See Goff, 421 F.3d at 790; Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert (VE) may be used. An ALJ posing a hypothetical to a VE is not required to include all of a plaintiff's limitations, but only those which he finds credible. See Goff, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical."); Rautio, 862 F.2d at 180. Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. See Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006); Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir. 1989).

### III.
### DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. See Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. See Cox, 495 F.3d at 617; Krogmeier, 294 F.3d at 1022.

Plaintiff, who was born in 1965, testified that she dropped out of school after tenth grade because she could not sit and concentrate; she earned her GED; she was divorced and not

currently married; her twenty-three-year-old son lived with her and took care of her; her son was unemployed, so they had no income; she had been in jail for a DUI; when her children were about three and four years old, after Child Protective Services was called by a neighbor, she had to go to classes to learn how to relate with small children, without cursing at or threatening them; in regard to her bipolar disorder, she had five good days and two bad days in a typical week; on bad days, she did not get out of bed other than to use the restroom; the longest such period she did this was for seven days in 2007; she had fibromyalgia, which caused her pain all over; when she hurt, she had to lie down and sleep; she had breathing problems for which she used a nebulizer; she had urinary and fecal incontinence; she would get severe cramping, which required her to lie down for a few minutes to hours; and she had migraines every three months. (Tr. 54-78).

The ALJ found Plaintiff met the insured status through December 31, 2012; she had not engaged in substantial gainful activity since March 1, 2008; Plaintiff had the severe impairments of arthralgias, asthma, and bipolar disorder; and Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. After considering evidence of record, including Plaintiff's credibility, the ALJ found that Plaintiff had the following RFC: She could lift and carry up to 50 pounds occasionally and up to 25 pounds frequently; she could sit, stand and/or walk a total of 6 hours in an 8-hour workday; she must avoid concentrated exposure to pulmonary irritants; and she was limited to simple routine tasks performed independently, and which involve working primarily with things rather than people, and which require only superficial interaction with co-workers and supervisors, and no interaction with the general public. The ALJ concluded that Plaintiff was unable to perform any of her past relevant work; given her age, limited education, work experience, and RFC, there

were jobs, existing in the national economy in significant numbers, which Plaintiff could perform; and, therefore, Plaintiff was not disabled within the meaning of the Act.

Plaintiff contends the ALJ's decision is not supported by substantial evidence because the ALJ gave improper weight to the opinion of David Goldman, M.D., who is a psychiatrist and a specialist in bipolar disorder; the ALJ gave improper weight to the opinions of Merry Durst, R.N., and Frank Froman, Ed.D.; the ALJ's credibility determination was flawed; and the ALJ's RFC analysis was inadequate because Plaintiff is unable to work on a full-time basis. Particularly, Plaintiff claims she is unable to work on a full-time basis because she would miss at least one day of work a month, and because her mental illness would leave her unable to go to and stay at work every day. For the following reasons, the court finds that Plaintiff's arguments are without merit and that the ALJ's determination is based on substantial evidence.

## A.      Plaintiff's Credibility:

The court will first consider the ALJ's credibility determination, as the ALJ's evaluation of Plaintiff's credibility was essential to the ALJ's determination of other issues, including Plaintiff's RFC. See Myers v. Colvin, 721 F.3d 521, 527-28 (8th Cir. 2013) (finding no error where ALJ phrased the credibility determination in terms of the RFC determination where he provided thorough analysis of the credibility issue that relied on more than the absence of objective medical evidence); Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[The plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible.") (citing Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005)); 20 C.F.R. §§ 404.1545, 416.945 (2010). As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole; a court cannot substitute its judgment for that of the ALJ. See Renstrom v.

Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012) ("If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination.") (quoting Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir.2008)); Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Hutsell, 892 F.2d at 750.

To the extent that the ALJ did not specifically cite Polaski, other case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence. See Randolph v. Barnhart, 386 F.3d 835, 842 (8th Cir. 2004); Wheeler v. Apfel, 224 F.3d 891, 895 n.3 (8th Cir. 2000); Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995).

Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for the ALJ to make. See Partee v. Astrue, 638 F.3d 860, 865 (8th Cir. 2011) ("The ALJ is not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting a claimant's subjective complaints."); Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000). See also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered."); Strongson, 361 F.3d at 1072; Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714

(8th Cir. 2003). See also Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010); Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). For the following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, the ALJ considered, in regard to Plaintiff's pain, that Plaintiff failed to pursue a rheumatology consultation recommended by Jeffrey Wells, D.O., Plaintiff's primary doctor, in 2008. (Tr. 19). Although Plaintiff was warned regarding her using marijuana rather than prescription medication to treat pain, she continued to use marijuana, as discussed below. See Eichelberger, 390 F.3d at 589 (holding that the ALJ properly considered that the plaintiff cancelled several physical therapy appointments) (citing Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (claimant's failure to comply with prescribed medical treatment and lack of significant medical restrictions is inconsistent with complaints of disabling pain). See also Wildman v. Astrue, 596 F.3d 959, 968-69 (8th Cir. 2010) (it is permissible for ALJ to consider claimant's non-compliance with prescribed medical treatment); Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989) (holding that an ALJ can discredit subjective complaints of pain based on claimant's failure to follow prescribed course of treatment).

Second, the ALJ considered medical records reflecting a lack of subjective complaints by Plaintiff. Contradictions between a claimant's sworn testimony and what she actually told physicians weighs against the claimant's credibility. Karlix v. Barnhart, 457 F.3d 742, 748 (8th Cir. 2006). See also Karlix, 457 F.3d at 748 (affirming where ALJ found claimant unreliable where his testimony regarding his consumption of alcohol conflicted with medical records; this inconsistency was sufficient to discredit claimant). In this regard, the ALJ considered that, although Plaintiff complained of joint pain to Dr. Wells, in mid-2008, she did not report such

pain again until September 2009, despite seeing Dr. Wells for other ailments during this period. (Tr. 19). When Plaintiff presented for a pap smear in April 2011, she indicated that she felt "well," and had no complaints, and, despite her allegations that she had difficulty sleeping due to her mental impairments and generalized pain, she said she was sleeping well, and was getting nine hours of sleep a night. (Tr. 20).

Third, in regard to Plaintiff's physical impairments, the ALJ considered that medical treatment notes and doctors' observations were inconsistent with her claims that these conditions were disabling. See Ramirez v. Barnhart, 292 F.3d 576 (8th Cir. 2002) (while an ALJ may not disregard subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence) (citing 20 C.F.R. § § 416.908, 416.929). In particular, the ALJ considered that Dr. Wells reported, in September 2009, that Plaintiff's *strength was 5/5* in all extremities, and that *she had 5/5 grip* strength bilaterally; and that Dr. Wells noted no other abnormal signs. (Tr. 19). When Plaintiff was seen at the University of Missouri Rheumatology Clinic in October 2009, x-rays of Plaintiff's shoulders were normal and x-rays of her hips showed only mild degenerative changes. Physical examination revealed 16 of 18 positive tender points, diffuse back and neck pain, and pain during range of motion testing. However, Plaintiff was able to bear her weight and *ambulate without difficulty*. (Tr. 20). As for Plaintiff's mental impairments, the ALJ considered that prior to the 1-year gap in Plaintiff's receiving mental health treatment, records indicated that she was doing well. (Tr. 21).

Fourth, the ALJ considered gaps in Plaintiff's treatment. Seeking limited medical treatment is inconsistent with claims of disabling pain. See Edwards v. Barnhart, 314 F.3d 964,

967 (8th Cir. 2003) ("[T]he ALJ concluded, and we agree, that if her pain was as severe as she alleges, [Plaintiff] would have sought regular medical treatment."); Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) ("[Claimant's] failure to seek medical assistance for her alleged physical and mental impairments contradicts her subjective complaints of disabling conditions and supports the ALJ's decision to deny benefits."). See also Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006) (upholding an ALJ's determination a claimant lacked credibility due in part to "absence of hospitalizations . . . , limited treatment of symptoms, [and] failure to diligently seek medical care"); 20 C.F.R. § 404.1529(c)(3)(v) (the agency will consider the claimant's treatment when evaluating her symptoms); Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (citing Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990)); Comstock v. Chater, 91 F.3d 1143, 1146-46 (8th Cir. 1996) (citing Benskin, 830 F.2d at 884); Polaski, 739 F.2d at 1322. In particular, the ALJ considered that, although Plaintiff complained of "severe" pain to Dr. Wells in September 2009, he did not request to see Plaintiff again for six months. (Tr. 19). Further, after Plaintiff sought treatment for fatigue in October 2009, she did not again seek treatment for this condition. (Tr. 20). In regard to Plaintiff's asthma, the ALJ considered that Plaintiff sought treatment for shortness of breath only once, in June 2010. (Tr. 21).

As for Plaintiff's mental impairment, the ALJ considered that Plaintiff failed to seek treatment for over a year; that she testified she did not seek treatment during this period due to lack of insurance and resources; and that there was no evidence Plaintiff ever sought free or low-cost mental health care. (Tr. 21). The record, however, reflects that Plaintiff's monthly medication copayments for Sertraline, Ventolin, Abilify, Prednisone, Albuterol, and Advair ranged from $1.00 to $2.00 (Tr. 438), yet she bought cigarettes and marijuana on a daily basis through the relevant period. In particular, in January 2009, Plaintiff reported that she used

14

marijuana every day (Tr. 1018); in December 2009, she reported that she used marijuana occasionally, for pain, and smoked a half package of cigarettes a day (Tr. 991); in November 2010, Plaintiff reported that she had smoked marijuana "for 32 years every day" and that she smoked a package of cigarettes every day (Tr. 1075); and in December 2010 and January and March 2011, Plaintiff said she smoked marijuana on a daily basis (Tr. 1090, 1093, 1145). Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (holding that, despite a plaintiff's argument that he was unable to afford prescription pain medication, an ALJ may discredit complaints of disabling pain where there is no evidence that the claimant sought treatment available to indigents); (Haynes v. Shalala, 26 F.3d 812, 814 (8th Cir. 1994); Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir. 1987) (holding that treatment by hot showers and taking dosages of Advil and aspirin do not indicate disabling pain); Cruse v. Bowen, 867 F.2d 1183, 1187 (8th Cir. 1989) (holding that minimal consumption of pain medication reveals a lack of disabling pain); Rautio v. Bowen, 862 F. 2d 176, 179 (8th Cir. 1988) (failure to seek aggressive treatment and limited use of prescription medications is not suggestive of disabling pain).

Fifth, the ALJ considered Plaintiff's work history, specifically that it was only "fair," and that she had earnings equaling or in excess of substantial gainful employment in "only 8 out of 15 years preceding her alleged onset date." The ALJ concluded that Plaintiff's fair work history demonstrated "some limited work motivation, and neither strengthen[ed] or diminshe[d] the credibility of her assertion of disability." (Tr. 20). Plaintiff argues that her work history, of being fired "over and over again" supports her claim for benefits. Plaintiff, however, worked as an assistant manager, in retail, from May 2003 until March 2008, just prior to her alleged disability onset date. (Tr. 296). As argued by Defendant, this discredits Plaintiff's theory regarding her alleged demonstrated inability to maintain employment. Moreover, Plaintiff told

Emilee Hill, PGC, RASAC II, that if she were to receive disability benefits, she "would think about applying for a part time job." (Tr. 1077). Additionally, Plaintiff reported, on February 22, 2011, that she wanted "to [] become a stripper." (Tr. 1088). See 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."). Finally, Plaintiff testified that she worked in a warehouse, as an order picker, until she got in a fight with a co-worker and was let go (Tr. 57-58); she was fired from McDonalds after she exchanged words with a customer (Tr. 59); she quit a job as a meat cutter after she got into a fight (Tr. 59-60); she lost her job as a bartender after she got a DUI (Tr. 60); she worked at a frozen food business, but lost her job because she was not efficient (Tr. 60-61); she was fired as a bartender, from another place, after she had a confrontation with a customer (Tr. 61); and she lost her job in retail, after five years, when she chased a customer into the parking lot and threatened to beat him up (Tr. 62). Significantly, to the extent Plaintiff contends she cannot get along with other people, the RFC assigned to her by the ALJ accommodated this limitation.

Sixth, the ALJ considered that no acceptable medical source in the record "made or even alluded to [] a diagnosis" of fibromyalgia. While Deanna Davenport, NP, noted Plaintiff had "probable fibromyalgia," Nurse Davenport was not an acceptable medical source. See SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006) ("[O]nly 'acceptable medical sources' can give us medical opinions."); 20 C.F.R. §§ 404.1513(a), 416.913(a) (excluding therapists and nurse practitioners from the list of acceptable medical sources).

Seventh, the ALJ considered that Plaintiff's treating sources prescribed "rather conservative treatment." Conservative treatment and no surgery are consistent with discrediting a claimant's allegation of disabling pain. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). In

particular, the ALJ considered that Plaintiff had not taken narcotic pain relievers with any frequency, and that she had never been referred to physical therapy or pain management. The ALJ also considered, in regard to Plaintiff's mental impairments that Plaintiff never required inpatient treatment since her alleged onset date. (Tr. 21).

Eighth, the ALJ considered that no doctor ever opined that Plaintiff was disabled due to joint pain or fibromyalgia. (Tr. 20). See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) ("We find it significant that no physician who examined Young submitted a medical conclusion that she is disabled and unable to perform any type of work.") (citing Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir. 1996)).

Ninth, in regard to Plaintiff's asthma, the ALJ concluded that the record indicated medication controlled this condition, given that Plaintiff said she used a nebulizer and sought treatment for this condition only once. (Tr. 21). Likewise, for Plaintiff's alleged mental impairment, the ALJ noted that Plaintiff's prescribed medications and dosages remained consistent during her outpatient treatment, and he concluded that treatment notes indicated Plaintiff did well with treatment and medication. (Tr. 20-21). Further, Nurse Dust indicated that Plaintiff was "functioning well," when compliant with her medication. (Tr. 2013). On January 2009, Plaintiff self-reported that medication kept her bipolar disorder stable (Tr. 1025, 1035), and, in November 2010, Plaintiff reported that she had been taking her medications without problems and had been doing "okay" (Tr. 1089). If an impairment can be controlled through treatment or medication, it cannot be considered disabling. Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997).

Tenth, Plaintiff often reported that her symptoms worsened with stress. See Dunahoo v. Apfel, 241 F.3d 1033, 1039-40 (8th Cir. 2001) (depression was situational and not disabling

because it was due to denial of food stamps and workers compensation and because there was no evidence that it resulted in significant functional limitations). In particular, in May 2008, Plaintiff reported that her stressors were recently losing her job and financial problems. (Tr. 591). In November 2010, Plaintiff reported that she was stressed about money. (Tr. 1086). In December 2010, she said everything was "going good," but on Christmas Eve she was "feeling a little blue, worrying about money; the next day she was "fine." (Tr. 1087). In February 2011, Plaintiff reported that she was stressing about her children (Tr. 1088), and, in May 2011, she said she was "mentally doing real good," but that she was stressing about her disability hearing (Tr. 1138). See Dunahoo v. Apfel, 241 F.3d 1033, 1039-40 (8th Cir. 2001) (depression which was situational and, therefore, not disabling because it was due to denial of food stamps and workers compensation and because there was no evidence that it resulted in significant functional limitations).

Eleventh, Plaintiff's daily activities were inconsistent with her allegations of disabling impairments. In particular, Plaintiff reported to Dr. Forman, in August 2009, that she had a driver's license and a car, and could drive reasonable distances; her hobbies included caring for her dogs, driving her Harley, and feeding fish in the pond. Plaintiff "indicated that she [could] do most everything, although on some days when [she was] depressed, [she] d[id]n't care to." She also "indicate[d] that she did numerous chores around the house" and cooked "for the guys." (Tr. 720-21). In January 2011, Plaintiff reported that she helped her friends in the community who also experienced anxiety; she was a "very sociable person and enjoy[ed] having friends around her"; she had good relationships with her adult children; and she had her own apartment and was "dependent upon only herself." It was noted in January 2011 that Plaintiff was to "increase community integration" and "develop new leisure activities." (Tr. 1095). In February

2011, Plaintiff reported that "she [] continued to take care of all needs within the community," although she did so when she would not have to face a large crowd. Notably, although Plaintiff testified that she was unable to perform work requiring even very little interpersonal contact, she also reported, in February 2011, that she had been spending "quite a bit of time with friends." (Tr. 1096). In March 2011, Plaintiff reported that she continued to spend time with friends. (Tr. 1145). Plaintiff repeatedly reported that she could go out if she took her mediation. (Tr. 1096, 1191, 1208).

While the undersigned appreciates that a claimant need not be bedridden before she can be found disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with her subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. See Clevenger v. Soc. Sec. Admin., 567 F.3d 971, 976 (8th Cir. 2009) (cases send mixed signals about significance of daily activities, but noting claimant reported she engaged in an array of activities; it was not unreasonable under case law for ALJ to rely on this evidence to infer claimant's assertion of disabling pain was not entirely credible); Pirtle v. Astrue, 479 F.3d 931, 935 (8th Cir. 2007) (claimant's ability to homeschool her two children was inconsistent with allegation of disability); Eichelberger, 390 F.3d at 590 (ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). Indeed, the Eighth Circuit holds that allegations of disabling "pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001). "Inconsistencies between [a claimant's] subjective complaints and [his] activities diminish [his] credibility." Goff, 421 F.3d at 792. See also Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001); Nguyen v. Chater, 75 F.3d 429, 439-41 (8th

Cir. 1996) (holding that a claimant's daily activities, including visiting neighbors, cooking, doing laundry, and attending church, were incompatible with disabling pain and affirming denial of benefits at the second step of analysis).

Twelfth, when Plaintiff left her last job at Big Lots, she was fired after a confrontation with a customer, not because of any physical disability.

**B.      Plaintiff's Mental Impairments, Dr. Goldman's and Dr. Froman's Opinions:**

Regarding mental impairments, 20 C.F.R. Ch. lll, Pt. 404, Supt. P, App.1 § 12.00(a) states, in relevant part, that:

> The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.

The Commissioner has supplemented the familiar five-step sequential process for generally evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments. 20 C.F.R. § 404.1520a. A special procedure must be followed at each level of administrative review. See Pratt v. Sullivan, 956 F.2d 830, 834 n.8 (8th Cir. 1992) (per curiam).

The mere existence of a mental condition, however, is not per se disabling. See Dunlap v. Harris, 649 F.2d 637, 638 (8th Cir. 1981). The sequential process for evaluating mental impairments is set out in 20 C.F.R. § 404.1520a. This Regulation states that the steps set forth in § 404.1520 also apply to the evaluation of a mental impairment. § 404.1520a(a). However, other considerations are included. The first step is to record pertinent signs, symptoms, and findings to determine if a mental impairment exists. 20  C.F.R. § 404.1520a(b)(1). These are

gleaned from a mental status exam or psychiatric history and must be established by medical evidence consisting of signs, symptoms, and laboratory findings. 20 C.F.R. § § 404.1520a(b)(1).

If a mental impairment is found, the ALJ must then analyze whether certain medical findings relevant to ability to work are present or absent. 20 C.F.R.§ 404.1520a(b)(1). The procedure then requires the ALJ to rate the degree of functional loss resulting from the impairment in four areas of function which are deemed essential to work. 20 C.F.R. § 404.1520a(c)(2). Those areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings. 20 C.F.R. § 404.1520a(c)(3). The limitation in the first three functional areas of activities of daily living (social functioning and concentration, persistence, or pace) is assigned a designation of either "none, mild, moderate, marked, [or] extreme." 20 C.F.R. § 404.1520a(c)(4). The degree of limitation in regard to episodes of decompensation is determined by application of a four-point scale: "[n]one, one or two, three, four or more." Id. When "the degree of []limitation in the first three functional areas" is "none" or "mild" and "none" in the area of decompensation, impairments are not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1). When it is determined that a claimant's mental impairment(s) are severe, the ALJ must next determine whether the impairment(s) meet or are equivalent in severity to a listed mental disorder. This is done by comparing the medical findings about a claimant's impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. See 20 C.F.R. § 404.1520a(d)(2). If it is determined that a

claimant has "a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing," the ALJ must then assess the claimant's RFC. 20 C.F.R. § 404.1520a(d)(3).

Upon finding that Plaintiff did not suffer from a disabling mental disability, the ALJ considered the medical evidence, as required by the first step of a mental impairment analysis, as well as Plaintiff's functional limitations. See Pratt, 956 F.2d at 835; 20 C.F.R. §§ 404.1520a(b)(1), 404.1508. In particular, as discussed above in regard to Plaintiff's credibility, the ALJ considered that records reflect that Plaintiff did well when seeking treatment and taking medication; that she did not seek treatment for her mental conditions for over a year; and she never required inpatient treatment for her mental impairments during the relevant period. (Tr. 21). An Adult Mental Health Assessment, dated September 11, 2007, states that Plaintiff was "upbeat, talkative, . . . very clear of her needs/wants and [could] articulate these very well." Plaintiff appeared to be "assertive, confident, and extroverted." On that date it was determined that out-patient care was appropriate for Plaintiff because she had been "functioning well with her medication." (Tr. 589-90). The ALJ also considered that Plaintiff first began seeking psychiatric treatment in November 2007, at which time Valentina Vrtikapa, M.D., diagnosed her with bipolar disorder and assigned a Global Assessment of Functioning (GAF)[3] of "[m]ore than

---

[3] GAF is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment. Id. at 32. See also Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) ("[A] GAF score of 65 [or 70] ... reflects 'some mild symptoms (e.g. depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well, has some meaningful interpersonal relationships.'" (quoting Kohler v. Astrue, 546 F.3d 260, 263 (2d Cir. 2008) (quoting Am.

22

60," which represents only mild limitations. Dr. Vrtikapa reported, moreover, that Plaintiff was stable on her current medications; since her primary care doctor increased her Celexa she had been doing fine. Plaintiff denied "feeling depressed, hopeless/helpless," and having any problems with sleep and appetite, "with attention/concentration," or "mania/hypomania." She also denied suicidal/homicidal ideations, intentions, or plan, and having "any auditory/visual hallucinations." (Tr. 572-74). After seeing Dr. Vrtikapa, as considered by the ALJ, Plaintiff sought treatment every two or three months. Also, as considered by the ALJ, on February 26, 2008, it was reported that the impact of Plaintiff's medications was good, she had neutral mood and appropriate affect, and her appetite and sleep were good. (Tr. 594).

As considered by the ALJ, in July 2008, Dr. Wells reported that Dr. Vrtikapa changed Plaintiff from Celexa to Cymbalta, and "upped" her Cymbalta dosage, and that Dr. Vrtikapa said that Plaintiff was "fine, not depressed." (Tr. 635). As further considered by the ALJ, Marc Maddox, Ph.D., reviewed the evidence of record, on August 13, 2008. Dr. Maddox opined that Plaintiff had mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation, each of an extended duration. He assigned Plaintiff moderate

---

Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) (alterations in original). See also Goff, 421 F.3d at 791, 793 (affirming where court held GAF of 58 was inconsistent with doctor's opinion that claimant suffered from extreme limitations; GAF scores of 58-60 supported ALJ's limitation to simple, routine, repetitive work).

Although "the Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' ... GAF scores may still be used to assist the ALJ in assessing the level of a claimant's functioning." Halverson v. Astrue, 600 F.3d 922, 930-31 (8th Cir. 2010) (quoting 65 Fed. Reg. 50746, 50764-65, 2000 WL 1173632 (Aug. 21, 2000), and citing Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the [residual functional capacity], it is not essential to the RFC's accuracy.").

limitations in regard to a number of areas, generally consistent with the ALJ's RFC determination, and found Plaintiff was not significantly limited in regard to remembering locations and work-like procedures, understanding and remembering very short and simple instructions, carrying out very short and simple instructions, performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances, sustaining an ordinary routine without special supervision, making simple work-related decisions, and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness. (Tr. 598-612).

As considered by the ALJ, on August 19, 2008, soon after Dr. Maddox found Plaintiff had moderate limitations in certain areas, Dr. Vrtikapa reported that Plaintiff's behavior/functioning, appetite, and sleep were good, and her stressors were financial. (Tr. 624-25). As discussed above in regard to Plaintiff's credibility, a January 8, 2009 Adult Mental Health Assessment from Transitions of Western Illinois, completed by Nurse Durst and others, states that Plaintiff was using marijuana every day. It also stated that the following were within normal limits/not remarkable: Plaintiff's dress, motor skills, concentration/information processing, thought content, thought process reality orientation/attention, memory, and ability to participate in treatment. This Assessment also states that Plaintiff did not meet "serious impairment criteria." The "summary analysis of the Assessment states that Plaintiff was "very clear of her needs/wants" and that she could "articulate these very well." She was assertive, confident, and extroverted. (Tr. 1035-47).

On May 27, 2009, it was reported that Plaintiff's medication compliance was good; she had stressors relating to loss of her job and financial problems; and her appetite and sleep were good. (Tr. 591).

As additionally considered by the ALJ, Dr. Froman, a clinical psychologist, examined Plaintiff in August 2009. Dr. Froman reported that Plaintiff presented "somewhat anxiously," but that her ability to relate was good; her speech was clear, appropriate, easy to understand, and relevant; she was "easily able to answer questions"; and she smoked about 30 cigarettes a day. As discussed above in regard to Plaintiff's daily activities, Plaintiff related her daily activities to Dr. Froman, including that she could do "most everything." Dr. Froman further reported that Plaintiff was oriented and in good contact with reality. Plaintiff reported "numerous antisocial behaviors in the past, with episodes of an aggressive attitude and physical aggression still troubling her." Dr. Froman concluded that Plaintiff was able to perform "simple one and two stop assemblies at a competitive rate," able to get along adequately with coworkers and supervisors, and could understand oral and written instructions. Dr. Froman opined that he did not see Plaintiff as being able "to withstand the stress associate with customary employment," but further opined that she would not be "work-ready" until her medication stabilized her. (Tr. 719-22).

The ALJ gave Dr. Froman's conclusion that Plaintiff was not work-ready diminished weight because he did not opine that Plaintiff's condition was expected to persist for twelve continuous months, and because his opinion is inconsistent with Plaintiff's treatment notes. See Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000). Additionally, Dr. Froman assigned Plaintiff a GAF of 54, which is in the moderate symptom range. See n.3; Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (where physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment). Dr. Froman, moreover, was not a treating doctor. See Clark v. Apfel, 141 F.3d 1253, 1256 (8th Cir. 1998) (controlling weight not given to one-time evaluating psychologist). Cf. 20 C.F.R. §§ 404.1527(d)(2)(i) &

416.927(d)(2)(i) ("Generally, the longer a treating source has treated [a claimant] and the more times [the claimant has] been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion.").  Notably, Dr. Froman's opinion that Plaintiff could not perform any work was inconsistent with notes stating that she was able to perform simple assemblies, able to get along adequately with co-workers and supervisors, and could follow instructions.  Finally, the ALJ did limit Plaintiff's RFC to work which required working primarily with things rather than people and to simple tasks, thus incorporating limitations imposed by Dr. Froman.  See Choate v. Barnhart, 457 F.3d 865, 869-70 (8th Cir. 2006) (holding that the limitations imposed by the ALJ as reflected in the claimant's RFC demonstrating that the ALJ gave some credit to the opinions of the treating physicians).  The court finds, therefore, that the ALJ gave proper weight to Dr. Froman's opinion and properly discounted Dr. Froman's ultimate conclusion.  Cf. Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's opinion does not automatically control or obviate the need to evaluate the record as whole and upholding the ALJ's decision to discount the treating physician's medical-source statement where limitations were never mentioned in numerous treatment records or supported by any explanation); Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data).

Nurse Durst completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental), on August 12, 2009, in which she opined that Plaintiff had marked limitations in regard to the ability to make judgments on simple and complex work-related decisions, and that she had moderate limitations in all other areas.  The court finds that the ALJ

properly declined to give Nurse Durst's opinion controlling weight given that she was not an acceptable medical source, see SSR 06-03p, 2006 WL 2329939, at *2 ("[O]nly 'acceptable medical sources' can give us medical opinions."); 20 C.F.R. §§ 404.1513(a), 416.913(a) (excluding therapists and nurse practitioners from the list of acceptable medical sources), and given that her conclusions are inconsistent with Plaintiff's treatment records, see Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician's opinion is given controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence").

The ALJ, moreover, did consider Nurse Durst's clinical observations from Plaintiff's treatment at Transitions. See 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1) (nurse practitioners are listed as "other" medical sources who may present evidence of the severity of the claimant's impairment and the effect of the impairment on the claimant's ability to work); cf. Shontos v. Barnhart, 328 F.3d 418, 426-27 (8th Cir. 2003) (nurse practitioner and a counselor were not acceptable medical sources, but nonetheless, where they were associated with acceptable medical sources, their opinions were entitled to greater weight than those of non-treating consultants). In this regard, Nurse Durst was one of the individuals who signed Plaintiff's January 8, 2009 Adult Mental Health Assessment from Transitions, the substance of which is discussed above. As considered by the ALJ, October 2, 3009 discharge records from Transitions, where Nurse Durst, Dr. Vrtikapa and others treated Plaintiff, reflect that Plaintiff was moving, and that, at the time of discharge, she had made satisfactory progress; her condition had improved; and that Plaintiff's

GAF had improved to 60, a score at the high end of the "moderate" symptom range. (Tr. 1033). See n.3.

As noted by the ALJ, after not seeking treatment for her mental impairments for over a year, Plaintiff was then seen by Dr. Goldman, a psychiatrist, at Mark Twain Behavioral Health, on October 22, 2010. Dr. Goldman reported on this date that Plaintiff was alert and oriented; she was cooperative during the interview; and Plaintiff said she smoked a package of cigarettes a day and smoked marijuana to treat her fibromyalgia. For a mental status examination Dr. Goldman asked Plaintiff questions to which she responded that "sleep suck[ed]; she had difficulty falling asleep and staying asleep due to anxiety and panic episodes; she sometimes had to make herself eat; her memory was shot; her concentration was not good; she had energy when she wanted to do something; her expectations for the interview were to keep herself on her "meds"; and she did not "really like being out around a lot of people." Dr. Goldman's impression was that Plaintiff had a GAF of 55, which is in the moderate range, and he recommended that she be seen for follow up in approximately four to six weeks. (Tr. 1070-73). See n.3.

An Initial Psychosocial/Clinical Assessment, signed by Dr. Goldman and others, and dated November 10, 2010, states that Plaintiff suffered from "severe anxiety and anxiety attacks to the point where she [did] not want to leave the house"; she struggled with hygiene when she was depressed and had past suicidal and homicidal ideations; Plaintiff did well with "household upkeep"; she was "motivated to get a part time job if she receive[d] disability and if she [could] stabilize her symptoms." (Tr. 1074-80).

Dr. Goldman opined in a Medical Source Statement of Ability to Do Work-Related Activities (Mental) that Plaintiff had marked limitations in her ability to understand and remember complex instructions, carry out complex instructions, make work-related judgments

28

on complex work-related decisions, interact appropriately with the public, supervisors, and co-workers, and respond appropriately to usual work situations and to changes in a routine work setting. He also indicated Plaintiff had moderate limitations in her ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions. He attributed these limitations to Plaintiff's anxiety disorder, attention deficit hyperactivity disorder (ADHD), and bipolar disorder, which he reported made Plaintiff "extremely uncomfortable in social situations," and uncomfortable with stressors and changes. He opined that Plaintiff's impairments made it difficult for her to be in settings outside the home, and that her bipolar disorder made her irritable, thus making it difficult for Plaintiff to be in group interactions or work settings. (Tr. 1150-52).

First, the ALJ properly decided to not give controlling weight to Dr. Goldman's opinion in the Medical Source Statement of Ability to Do Work-Related Activities (Mental) because it is inconsistent with his own report that Plaintiff had a GAF of 55, as well as records of other acceptable medical sources, including Dr. Vrtikapa. Cf. Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes."); Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight should not be given to the RFC assessment).

Second, Dr. Goldman's initial examination of Plaintiff was based primarily on Plaintiff's self-reported symptoms. See Renstrom v. Astrue, 680 F.3d 1057, 1064-65 (8th Cir. 2012) (affirming where ALJ did not give controlling weight to opinion of treating doctor, where doctor's opinion was "largely based on [claimant's] subjective complaints); Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (holding that the ALJ was entitled to give less weight to the

opinion of a treating doctor where the doctor's opinion was based largely on the plaintiff's subjective complaints rather than on objective medical evidence). Dr. Goldman's reliance on Plaintiff's self-reporting is significant, given the court's finding above that Plaintiff's allegations regarding her limitations are less than credible. See McCoy v. Astrue, 648 F.3d 605, 617 (8th Cir. 2011) (ALJ properly discounted doctor's opinion where evaluation was based, at least in part, on claimant's self-reported symptoms; insofar as claimant's self-reported symptoms were found to be less than credible, doctor's report was rendered less credible).

Third, although Dr. Goldman did not suggest he reviewed Plaintiff's prior medical records, he opined the limitations he imposed began in March 2008, well before he first saw Plaintiff in October 2010. Fourth, the ALJ did incorporate some of the limitations suggested by Dr. Goldman, in that the ALJ's RFC determination accounted for Plaintiff's serious limitations in social functioning; the ALJ limited Plaintiff to work performed independently, involving primarily things rather than people, and requiring no more than superficial interaction with supervisors and co-workers and no interaction with the general public. The ALJ also found Plaintiff could perform only simple routine tasks. See Choate v. Barnhart, 457 F.3d 865, 869-70 (8th Cir. 2006) (holding that the limitations imposed by the ALJ as reflected in the claimant's RFC demonstrating that the ALJ gave some credit to the opinions of the treating physicians); Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) ("In assessing [the claimant's] RFC, the ALJ determined that [the claimant] could sit for a total of six hours and stand for a total of two hours, but was limited to sedentary work. This in itself is a significant limitation, which reveals that the ALJ did give some credit to [the treating doctor's] medical opinions.").

Fifth, Dr. Goldman's opinion is also inconsistent with an October 2011 Mental Status questionnaire, which states that Plaintiffs appearance was normal, and her mood and affect were "2" on a scale of 1 to 3. (Tr. 1220).

Sixth, Dr. Goldman's opinion was inconsistent with the record as a whole. He indicated Plaintiff had "marked" limitations interacting with others, but her treatment notes repeatedly state she had a number of friends and socialized on a regular basis. (Tr. 1093, 1096, 1139, 1145, 1175, 1191-92, 1206). Although Dr. Goldman reported Plaintiff had difficulty leaving home, she reported leaving home five to seven times a week. (Tr. 1093). Thus, the record does not support Dr. Goldman's conclusion that Plaintiff was basically precluded from ever spending time with others outside her home. See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.").

Seventh, despite Plaintiff's argument to the contrary, Nurse Durst's opinion is less restrictive than that of Dr. Goldman. For example, Nurse Durst reported that Plaintiff did not meet serious impairment criteria (Tr. 1023), and that she had only moderate limitations in her ability to carry out and remember even complex instructions and that she only had mild restrictions in her ability to interact with the public and respond appropriately to usual work situations (Tr. 724). Eighth, when determining the weight to be given Dr. Goldman's opinion, the ALJ considered the record as whole. See Wilson v. Apfel, 172 F.3d 539, 542 (8th Cir. 1999) (quoting Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996) ("Although a treating physician's opinion is generally entitled to substantial weight, such opinion does not automatically control, since the record must be evaluated as a whole."). Ninth, to the extent Dr. Goldman opined that Plaintiff was unable to work at all, such an opinion invaded the province of

the Commissioner. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) (ALJ need not defer to treating doctor's opinion that claimant is totally disabled "because it invades the province of the Commissioner to make the ultimate disability determination").

Tenth, to the extent Dr. Goldman opined that Plaintiff was unable to work by virtue of checkmarks on a form, a treating physician's checkmarks on a form are conclusory opinions which can be discounted if contradicted by other objective medical evidence. Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004); Hogan, 239 F.3d at 961. See also Johnson v. Astrue, 628 F.3d 991, 992 (8th Cir. 2011) (checkmarks on a Medical Source Statement are "conclusory opinions" which can be discounted if contradicted by other objective medical evidence); Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) ("'The checklist format, generality, and incompleteness of the assessments limit [the assessments'] evidentiary value'. ... Indeed, '[a] treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory statements.'") (quoting Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) and Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996)).

Finally, the ALJ identified good reasons for not giving Dr. Goldman's opinion controlling weight. See King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as its not being supported by any detailed, clinical, or diagnostic evidence). In conclusion, the court finds that the ALJ gave proper weight to Dr. Goldman's opinion.

**C.      Plaintiff's RFC:**

As stated above, the ALJ found Plaintiff had the following RFC:  She could lift and carry up to 50 pounds occasionally and up to 25 pounds frequently; she could sit, stand and/or walk a total of 6 hours in an 8-hour workday; she must avoid concentrated exposure to pulmonary irritants; she was limited to simple routine tasks performed independently, and which involve working primarily with things rather than people, and which require only superficial interaction with co-workers and supervisors, and no interaction with the general public.

The Regulations define RFC as "what [the claimant] can do" despite his or her "physical or mental limitations."  20 C.F.R. § 404.1545(a).  "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments."  <u>Lauer v. Apfel</u>, 245 F.3d 700, 703 (8th Cir. 2001).  "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  <u>Tucker v. Barnhart</u>, 363 F.3d 781, 783 (8th Cir. 2004) (quoting <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000)).  <u>See also</u> <u>Myers v. Colvin</u>, 721 F.3d 521, 526 (8th Cir. 2013).

To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite his or her impairments.  Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" <u>Lauer</u>, 245 F.3d at 704 (quoting <u>Singh v. Apfel</u>, 222 F.3d 448, 451 (8th Cir. 2000)).  The Eighth Circuit clarified, in <u>Lauer</u>, 245 F.3d at 704, that "'[s]ome medical evidence,' <u>Dykes v. Apfel</u>, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's

33

RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." <u>Id.</u> <u>See also</u> <u>Vossen v. Astrue</u>, 612 F.3d 1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC.").

As required by the Regulations and case law, the ALJ in the matter under consideration identified Plaintiff's functional limitations and restrictions, and then assessed her work-related abilities on a function-by-function basis. <u>See</u> <u>Harris v. Barnhart</u>, 356 F.3d 926, 929 (8th Cir. 2004). To the extent Plaintiff argues the ALJ should have included limitations beyond those which he found credible, an RFC need only include a plaintiff's credible limitations. <u>See</u> <u>Tindell v. Barnhart</u>, 444 F.3d 1002, 1007 (8th Cir. 2006) ("The ALJ included all of Tindell's credible limitations in his RFC assessment, and the ALJ's conclusions are supported by substantial evidence in the record."). The court finds that the ALJ's RFC determination is consistent with his findings regarding the medical evidence and Plaintiff's credibility and that it is based on substantial evidence on the record. Moreover, the ALJ's determination of Plaintiff's RFC is precise as it directly addresses her restrictions, and it is based upon and consistent with all of the relevant evidence. <u>See</u> <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000) ("The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.") (citing <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995).

After determining Plaintiff's RFC, the ALJ posed a hypothetical to a VE which included all of Plaintiff's credible limitations. <u>See</u> <u>Martise v. Astrue</u>, 641 F.3d 909, 927 (8th Cir. 2011)

("The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole.") (quoting Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006)); Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[T]he ALJ was not obligated to include limitations from opinions he properly disregarded."); Guilliams v. Barnhart, 393 F.3d 789, 804 (8th Cir. 2005) (holding that a proper hypothetical sets forth impairments supported by substantial evidence and accepted as true by the ALJ); Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999) ("In posing hypothetical questions to a vocational expert, an ALJ must include all impairments he finds supported by the administrative record."). The VE testified that there was work in the national economy which a person of Plaintiff's age and with her RFC, education, and work experience could perform, and that such work was available in significant numbers. Given that the court has found that the ALJ's RFC determination is based on substantial evidence, the court further finds that the ALJ properly concluded, based on the testimony of the VE, that there is work which Plaintiff can perform and that she is, therefore, not disabled. See Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) ("Based on our previous conclusion ... that 'the ALJ's findings of [the claimant's] RFC are supported by substantial evidence,' we hold that '[t]he hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits.'") (quoting Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006)); Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008) (VE's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations); Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999) (ALJ need not include additional complaints in the hypothetical not supported by substantial evidence).

**IV.**
**CONCLUSION**

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports the Commissioner's decision denying Plaintiff benefits.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the relief sought by Plaintiff in her Complaint and Brief in Support of Complaint be **DENIED**; Docs. 1, 12.

**IT IS FURTHER RECOMMENDED** that a separate judgment be entered incorporating this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this 12th day of August, 2014.


/s/ Noelle C. Collins
UNITED STATES MAGISTRATE JUDGE